**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA GEORGIA**

| | |
|---|---|
| **KRISTEN YUKNA,** behalf of herself and all others similarly situated, | Case No. _____ |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| **MICROF LLC,** | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Kristen Yukna ("Plaintiff"), individually and on behalf of all similarly situated persons (the "Class" or "Class Members" (as further defined below)), alleges the following against Defendant Microf LLC ("Microf" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## I.     INTRODUCTION

1.     Plaintiff brings this putative class action lawsuit against Microf for its failure to properly secure and safeguard Plaintiff's and other similarly situated individuals' personally identifiable information ("PII") including their

1

names, Social Security numbers, and/or financial information (*e.g.*, account numbers and/or credit or debit card numbers) (collectively, "Private Information") from cybercriminals, resulting in a massive and preventable data breach.[1]

2.      Microf is a financial services firm specializing in lease-to-own solutions for HVAC and water heater systems.[2]

3.      Plaintiffs and Class Members are current and former customers of Microf.

4.      Microf disclosed a significant data breach on or around December 23, 2025, following a ransomware attack by the Qilin cybercriminal group (the "Data Breach" or "Breach").[3]

5.      According to the U.S. Department of Health and Human Services Health Sector Cybersecurity Coordination Center, "Qilin is a ransomware-as-a-service (RaaS) offering in operation since 2022, and which continues to target healthcare organizations and other industries worldwide…The group is also known to practice double extortion, demanding ransom payments from victims

---

[1]*See* **Exhibit 1** (Plaintiff's Notice of Data Breach Letter); https://blog.rankiteo.com/mic1766850884-ransomware-december-2025/; https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsP age (reporting names, Social Security numbers, and financial information (*e.g.*, account numbers and/or credit or debit card numbers) were exposed).
[2] https://microf.com/.
[3] https://blog.rankiteo.com/mic1766850884-ransomware-december-2025/.

to prevent data from being leaked."[4]

6.    The Data Breach, first publicized through filings with the Massachusetts and New Hampshire attorney general offices, exposed sensitive personal information, including names and Social Security numbers of affected consumers.[5]

7.    On or around December 23, 2025, Microf sent out notice of data breach letters ("Notice Letters") to individuals whose Private Information was compromised as a result of the Data Breach.

8.    According to the Notice Letters, on June 19, 2025, Microf detected unusual activity on its computer systems.[6] In response, Microf conducted an investigation which revealed that an unauthorized party had accessed its network without authorization between June 15, 2025 and June 19, 2025, and certain files were "viewed and/or copied."[7]

9.    Yet, Microf waited over six (6) months to notify the public (and the victims) of the Data Breach.[8]

10.    As a result of this delayed response, Plaintiff and Class Members had no idea that their Private Information had been compromised, and that

---

[4] https://www.hhs.gov/sites/default/files/qilin-threat-profile-tlpclear.pdf.
[5] https://blog.rankiteo.com/mic1766850884-ransomware-december-2025/.
[6] Exhibit 1.
[7] *Id.*
[8] *Id.*

they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. A risk that will remain for their respective lifetimes.

11.    The Private Information compromised in the Data Breach represents a gold mine for data thieves, including but not limited to, names and Social Security numbers that Microf collected and maintained. Upon information and belief, other types of highly sensitive PII were also exposed in the Data Breach.

12.    Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

13.    There has been no assurance offered by Microf that all personal data or copies of data have been recovered or destroyed, or that Defendant has adequately enhanced its data security practices sufficient to avoid a similar breach of its network in the future.

14.     Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

15.     Plaintiff brings this class action lawsuit to address Microf's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to Plaintiff and Class Members of the types of information that were accessed, and that such information was subject to unauthorized access by cybercriminals.

16.     The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Microf, and thus Microf was on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

17.     Upon information and belief, Microf failed to properly monitor its network and systems that housed Plaintiffs' and Class Members' Private Information. Had Microf properly monitored its networks, it would have discovered the Breach sooner.

18.    Plaintiff's and Class Members' identities are now at risk because of Microf's negligent conduct. The Private Information Microf collected and maintained is now in the hands of data thieves and other unauthorized third parties.

19.    Plaintiff seeks to remedy these harms on behalf of herself and on behalf of all other similarly situated individuals whose Private Information was accessed and/or stolen during the Data Breach.

## II.    PARTIES

20.    Plaintiff **Kristen Yukna** is, and at all times mentioned herein was, an individual citizen of Antioch, Illinois. Plaintiff received a Notice Letter from Defendant dated December 23, 2025, notifying her that her name and Social Security number were compromised in the Data Breach.[9]

21.    Defendant **Microf LLC** is a limited liability company organized under the laws of Delaware. Defendant's principal office address is 2849 Paces Ferry Rd. SE, Suite 625, Atlanta, Georgia 30339. Defendant's registered agent is Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.  The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who are members of the LLC and who may be responsible for some of the claims alleged herein are

---

[9] *Id.*

currently unknown to Plaintiffs. Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known, including the members of the LLC.

## III.    JURISDICTION AND VENUE

22.    The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

23.    This Court has jurisdiction over Defendant because Defendant has its principal place of business in this Atlanta, Georgia.  Defendant also conducts substantial business in this Georgia related to Plaintiff and Class Members and has sufficient minimum contacts with this District, and/or has members and/or managers domiciled in this District.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because Defendant has its principal place of business in this District and collected and maintained Plaintiff's and Class Members' PII in this District. Further, Venue is proper in this District because a substantial part of the

events or omissions giving rise to this action and Plaintiff's claims occurred in this District and/or Microf has harmed Class Members residing in this District.

## IV.   FACTUAL ALLEGATIONS

A. *Microf's Business and its Collection of Plaintiff's and Class Members' Private Information.*

25.   Microf provides HVAC and water heater financing solutions to individuals facing credit challenges.[10]

26.   As a condition of receiving services, Microf requires that its customers entrust it with their highly sensitive Private Information. Thus, in the ordinary course of business, Plaintiff and Class Members were required to provide their Private Information to Defendant.

27.   Defendant profits off the Private Information of Plaintiff and the Class. Without acquiring and collecting the Private Information of Plaintiff and Class Members, Microf would be unable to provide services and unable to obtain revenue. Thus, Microf's revenue is derived directly from Plaintiff's and Class Member's Private Information.

28.   Because of the highly sensitive and personal nature of the Private Information Microf acquires and stores, Microf, upon information and belief, promises to, among other things: (i) keep Private Information private; (ii)

---

[10] https://microf.com/about-us/.

comply with industry standards related to data security and the maintenance of its customers' Private Information; (iii) inform its customers of its legal duties relating to data security; (iv) comply with all federal and state laws protecting customers' Private Information; (v) only use and release customers' Private Information for reasons that relate to the services it provides; and (vi) provide adequate notice to customers if their Private Information is disclosed without authorization.

29.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Microf assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure and exfiltration.

30.    Despite this knowledge, Microf failed to implement adequate data security measures, resulting in a massive and preventable data breach.

**B. *The Data Breach and Microf's Inadequate Notice to Plaintiff and Class Members.***

31.    According to the Notice Letters, Microf became aware of unusual activity on its systems on June 19, 2025.[11]

_____

[11] Exhibit 1.

32.    It was only after an investigation that Microf learned that its network was accessed without authorization between June 15, 2025, and June 19, 2025, and that files containing Private Information of Plaintiff and Class Members "may have been viewed or copied by an unauthorized actor."[12]

33.    Through the Data Breach, the unauthorized cybercriminal(s) accessed a cache of highly sensitive Private Information, including the names, Social Security numbers, and/or financial information (*e.g.*, account numbers and/or credit or debit card numbers), of at least **7,011** Texas residents.[13] However, the full extent of the Data Breach is still unknown.

34.    On or about December 23, 2025, roughly six (6) months after the Breach occurred, Microf finally began to notify the victims that its investigation determined that their Private Information was potentially viewed and/or stolen.[14]

35.    Microf sent Notice Letters to Plaintiff and Class Members, alerting them that their highly sensitive Private Information was at risk of misuse and

---

[12] *Id.*
[13] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (reporting 7,011 Texas residents were affected by the Data Breach on December 29, 2025).
[14] Exhibit 1.

encouraging them to "remain vigilant against incidents of identity theft and fraud."[15]

36.    However, omitted from the Notice Letters are crucial details like: (i) the root cause of the Data Breach; (ii) the vulnerabilities exploited; and (iii) the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained nor clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

37.    Thus, Microf's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach was and is severely diminished.

38.    In addition, the Notice offers no substantive steps to help victims like Plaintiff and Class Members to protect themselves other than providing a limited offering of credit monitoring services—an offer that is woefully inadequate considering the lifelong increased risk of fraud and identity theft Plaintiff and Class Members now face as a result of the Data Breach.

---

[15] *Id.*

39.    Microf claims that it is "further enhance" its existing safeguards but these "enhancements" should have been in place ***prior*** to the Data Breach.[16] Moreover, Microf does not meaningfully describe what these "enhancements" are.[17]

40.    Microf had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

41.    Plaintiff and Class Members provided their Private Information to Microf with the reasonable expectation and mutual understanding that Microf would comply with its obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

42.    Microf's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

43.    Microf knew or should have known that its electronic records would be targeted by cybercriminals.

---

[16] *Id.*
[17] *Id.*

**C.** *Microf Knew or Should Have Known of the Risk of a Cyber Attack Because Businesses in Possession of Private Information are Particularly Susceptible to Data Breaches.*

44.    Microf's negligence, including its gross negligence, in failing to safeguard Plaintiff's and Class Members' Private Information is particularly stark, considering the highly public increase of cybercrime similar to the incident that resulted in the Data Breach.

45.    The financial industry is consistently one of the top targets for data breaches. "Between 2019 and 2023, the number of data compromise incidents involving financial institutions increased by over 330 percent."[18]

46.    Data thieves regularly target entities like Microf due to the highly sensitive customer information it maintains.

47.    "Financial institutions are custodians of some of the most sensitive and lucrative data on the web: Social Security numbers, credit card details, investment portfolios, bank account credentials, and real-time transaction records. To threat actors, this isn't just data, it's digital gold. Whether sold on dark web forums, used in account takeover fraud, or exploited for identity theft, the payload potential is massive."[19]

---

[18]    https://www.statista.com/topics/9918/cyber-crime-and-the-financial-industry-in-the-united-states/#topicOverview.

[19]    https://www.tripwire.com/state-of-security/bullseye-banks-why-financial-services-remain-prime-target-cyberattacks.

48.    Microf knew and understood that Plaintiff's and Class Members' Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

49.    According to the Identity Theft Resource Center's 2023 Data Breach Report, the overall number of publicly reported data compromises in 2023 increased more than 72-percent over the previous high-water mark and 78-percent over 2022.[20]

50.    In 2024, there were a total of 3,158 total compromises.[21]

51.    Despite the prevalence of public announcements of data breach and data security compromises, Microf failed to take appropriate steps to protect Plaintiff's and Class Members' Private Information from being compromised in this Data Breach.

52.    As a large company in possession of hundreds of individuals' Private Information, Microf knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences they would suffer if Microf's data security systems were breached. Such consequences include the significant

---

[20] *2023 Annual Data Breach Report*, IDENTITY THEFT RESOURCE CENTER, (Jan. 2024),    *available    online    at*:    https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.

[21]    *2024 Annual Data Breach Report*, IDENTITY THEFT RESOURCE CENTER https://www.idtheftcenter.org/publication/2024-data-breach-report/.

costs imposed on Plaintiff and Class Members due to the unauthorized exposure of their Private Information to criminal actors. Nevertheless, Microf failed to take adequate cybersecurity measures to prevent the Data Breach or the foreseeable injuries it caused.

53.    Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals, for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

54.    Microf was, or should have been, fully aware of the unique type and the significant volume of data on Microf's network server(s) and systems and the significant number of individuals who would be harmed by the exposure of the unencrypted data.

55.    Plaintiff and Class Members were the foreseeable and probable victims of Microf's inadequate security practices and procedures. Microf knew or should have known of the inherent risks in collecting and storing the Private Information and the critical importance of providing adequate security for that data, particularly due to the highly public trend of data breach incidents in recent years.

15

**D. *Microf Failed to Comply with FTC Guidelines.***

56.    The Federal Trade Commission (FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

57.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[22] The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that

---

[22] *Protecting Personal Information: A Guide for Business,* FEDERAL TRADE COMMISSION (October 2016), *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

58.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

59.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

60.    Such FTC enforcement actions include those against businesses that fail to adequately protect customer data, like Microf here. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215,

at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

61.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Microf of failing to use reasonable measures to protect Private Information they collect and maintain from consumers.  The FTC publications and orders described above also form part of the basis of Microf's duty in this regard.

62.    The FTC has also recognized that personal data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[23]

---

[23] FTC Commissioner Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), *transcript available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

63. As evidenced by the Data Breach, Microf failed to properly implement basic data security practices. Microf's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

64. Microf was at all times fully aware of its obligation to protect the Private Information of its customers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**E. *Microf Failed to Comply with Industry Standards.***

65. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

66. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management,

Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[24]

67.    The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a.    Control who logs on to your network and uses your computers and other devices.

b.    Use security software to protect data.

c.    Encrypt sensitive data, at rest and in transit.

d.    Conduct regular backups of data.

e.    Update security software regularly, automating those updates if possible.

f.    Have formal policies for safely disposing of electronic files and old devices.

g.    Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

---

[24] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list.

68.    Further, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (i) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (ii) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (iii) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[25]

69.    Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the

---

[25] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations.

NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

**F.** *Microf Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information.*

70.    In addition to its obligations under federal and state laws, Microf owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Microf owed a duty to Plaintiff and Class Members to provide reasonable security, including complying with industry standards and requirements, training for its staff, and ensuring that its computer systems, networks, and protocols adequately protected the Private Information of Class Members

71.    Microf breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly

maintain and safeguard its computer systems and data. Microf's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.  Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.  Failing to adequately protect Private Information;

    c.  Failing to properly monitor its own data security systems for existing intrusions;

    d.  Failing to sufficiently train its IT personnel regarding the proper handling of its customers' Private Information;

    e.  Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTC Act;

    f.  Failing to adhere to industry standards for cybersecurity as discussed above; and

    g.  Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

72.    Microf negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

73.    Had Microf remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security

measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

74.    Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Microf

**G. *As a result of the Data Breach, Plaintiff and Class Members Are at a Significantly Increased Risk of Fraud and Identity Theft.***

75.    The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[26] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce

---

[26] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* FEDERAL TRADE COMMISSION (Oct. 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf.

also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

76.    Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

77.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

78.    In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not

previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

79.     Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

80.     One such example of how malicious actors may compile Private Information is through the development of "Fullz" packages.

81.     Cybercriminals can cross-reference two (2) sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

82.     The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not

be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen Private Information are being misused, and that such misuse is fairly traceable to the Data Breach.

83.    For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[27] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

84.    Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official

---

[27] *See IdentityTheft.gov,* FEDERAL TRADE COMMISSION, *available at*: https://www.identitytheft.gov/Steps.

identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

85.    PII is data that can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-to-reward analysis illustrates beyond doubt that PII has considerable market value.

86.    The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[28] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry.

---

[28] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. DEP'T OF JUSTICE (Feb. 10, 2020), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military.

87.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[29] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[30]

88.    Furthermore, even information such as names, email addresses and phone numbers can have value to a hacker. Beyond things like spamming customers, or launching phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual. It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use

---

[29] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[30] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

them as part of their threat campaigns to compromise accounts and send phishing emails."[31]

89.    The Dark Web Price Index of 2023, published by PrivacyAffairs, shows how valuable just email addresses alone can be, even when not associated with a financial account: [32]

| Email Database Dumps | Avg. Price USD (2022) |
|---|---|
| 10,000,000 USA email addresses | $120 |
| 600,000 New Zealand email addresses | $110 |
| 2,400,000 million Canada email addresses | $100 |

90.    Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails. If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

91.    Likewise, the value of PII is increasingly evident in our digital economy. Many companies, including Microf, collect PII for purposes of data

---

[31] *See Dark Web Price Index: The Cost of Email Data,* MAGICSPAM, https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/.
[32] *See Dark Web Price Index 2023*, PRIVACY AFFAIRS, https://www.privacyaffairs.com/dark-web-price-index-2023/.

analytics and marketing. These companies collect it to better target customers and share it with third parties for similar purposes.[33]

92.    One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[34]

93.    Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it.

94.    A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user. In this

---

[33]    *See    Privacy    Policy*,    Robinhood, https://robinhood.com/us/en/support/articles/privacy-policy/.
[34] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

95.    Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiff's PII impairs their ability to participate in the economic marketplace.

96.    The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[35] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

- 77-percent experienced financial-related problems;

- 29-percent experienced financial losses exceeding $10,000;

- 40-percent were unable to pay bills;

- 28-percent were turned down for credit or loans;

- 37-percent became indebted;

- 87-percent experienced feelings of anxiety;

- 67-percent experienced difficulty sleeping; and

- 51-percent suffered from panic of anxiety attacks.[36]

---

[35] *2023 Consumer Impact Report* (Jan. 2024), IDENTITY THEFT RESOURCE CENTER, *available online at*: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf.
[36] *Id* at pp 21-25.

97.    It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[37]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

98.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

---

[37] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf.

99.    As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

## V.    PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

### A. *Plaintiff Yukna's Experience.*

100.    Plaintiff is a customer of Defendant.

101.    As a condition of obtaining services from Microf, Plaintiff was required to provide her Private Information to Defendant.

102.    Plaintiff had the reasonable expectation and mutual understanding that Defendant would protect her Private Information from unauthorized access.

103.    Plaintiff received a Notice Letter from Microf dated December 23, 2025, informing her that her name and Social Security number were impacted by the Data Breach.[38]

104.    The Notice Letter only offered Plaintiff twelve (12) months of credit monitoring services. However, twelve (12) months of credit monitoring is not sufficient given that Plaintiff will now experience a lifetime of increased risk

---

[38] Exhibit 1.

of identity theft and other forms of targeted fraudulent misuse of her Private Information.

105.   Plaintiff suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach. This time spent includes: (i) monitoring her accounts for fraud; (ii) reviewing her credit reports for fraudulent activity; and/or (iii) researching the Data Breach.

106.   Plaintiff would not have provided her Private Information to Defendant had Defendant disclosed that its systems lacked adequate data security to safeguard her Private Information.

107.   Plaintiff suffered actual injury in the form of having her Private Information compromised and/or stolen as a result of the Data Breach.

108.   Plaintiff suffered actual injury from loss of privacy the moment her Personal Information was accessed and acquired by cybercriminals.

109.   Upon information and belief, cybercriminals will sell Plaintiff's and Class Members' Private Information on the dark web or leak it on the dark web after Microf refuses to pay a ransom payment—if they have not already— because that is the *modus operandi* of cybercriminals who perpetrate data breaches such as this.

110.   Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible

property that Plaintiff entrusted to Defendant for the purpose of receiving services from Defendant and which was compromised in, and as a result of the Data Breach.

111.   Plaintiff suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of cybercriminals.

112.   Plaintiff has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. This interest is particularly acute, as Defendant's systems have already been shown to be susceptible to compromise and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect Private Information

113.   As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: (i) researching the Data Breach; (ii) reviewing financial accounts and/or credit reports for any indications of actual or attempted identity theft or fraud; and/or (iii) researching the credit monitoring services offered by Defendant, as well as long-term credit monitoring options she will now need to use. Plaintiff has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

114.   As a result of the Data Breach, Plaintiff has suffered anxiety as a result of the release of her Private Information to cybercriminals, which Private Information she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of committing cyber and other crimes against him. Plaintiff is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach will have on her life.

115.   Plaintiff also suffered actual injury as a result of the Data Breach in the form of: (i) damage to and diminution in the value of her Private Information, a form of property that Defendant obtained from Plaintiff; (ii) violation of her privacy rights; and (iii) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

116.   As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

**B. *Common Injuries Among Plaintiff and Class Members.***

117.   In sum, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

118. Plaintiff and Class Members entrusted their Private Information to Defendant in order to receive services.

119. Plaintiff's and Class Members' Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendant's inadequate data security practices.

120. Plaintiff and Class Members suffered actual injury from loss of privacy the moment their Personal Information was accessed and acquired by cybercriminals.

121. As a direct and proximate result of Microf's actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

122. Further, as a direct and proximate result of Microf's conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

123. Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely

use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

124. The Private Information maintained by and stolen from Defendant's systems, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

125. Additionally, as a direct and proximate result of Microf's conduct, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the data breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

126. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

127. Additionally, Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private

Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[39] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[40]

128.     As a result of the Data Breach, Plaintiff's, and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

129.     Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. The contractual bargain entered into between Plaintiff and Heartland included Defendant's contractual obligation to provide adequate

---

[39] *See How Data Brokers Profit from the Data We Create*, THE QUANTUM RECORD,     https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/.

[40] *Frequently Asked Questions,* NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

data security, which Defendant failed to provide. Thus, Plaintiff and Class Members did not get what they bargained for.

130.   Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

    a. Monitoring for and discovering fraudulent charges;

    b. Canceling and reissuing credit and debit cards;

    c. Addressing their inability to withdraw funds linked to compromised accounts;

    d. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    e. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    f. Contacting financial institutions and closing or modifying financial accounts;

    g. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

h.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and/or

i.  Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

131.  Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Microf, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

132.  As a direct and proximate result of Microf's actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## VI.    CLASS ACTION ALLEGATIONS

133.  Plaintiff brings this action individually and on behalf of all others similarly situated, pursuant to Federal Rule of Civil Procedure 23.

134. Specifically, Plaintiff proposes the following Nationwide Class (the "Class" or "Class Members"), subject to amendment as appropriate:

**Nationwide Class**

All residents of the United States who had their Private Information compromised as a result of the Data Breach, including all individuals were sent a Notice Letter.

135. Excluded from the Nationwide Class are Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

136. Plaintiff reserves the right to modify or amend the definition of the proposed Class or add subclasses before the Court determines whether certification is appropriate.

137. The proposed Nationwide Class meets the criteria for certification under Federal Rule of Civil Procedure 23.

138. **<u>Numerosity</u>.** The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of at least thousands of individuals, whose data was compromised in

the Data Breach. The identities of Class Members are ascertainable through Microf's records, Class Members' records, publication notice, self-identification, and other means.

139. **Commonality.** There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.  Whether Microf engaged in the conduct alleged herein;

    b.  Whether Microf's conduct violated the state and federal laws invoked below;

    c.  When Microf learned of the Data Breach;

    d.  Whether Microf's response to the Data Breach was adequate;

    e.  Whether Microf unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

    f.  Whether Microf failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

    g.  Whether Microf's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether Microf's data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether Microf owed a duty to Class Members to safeguard their Private Information;

j. Whether Microf breached its duty to Class Members to safeguard their Private Information;

k. Whether hackers obtained Class Members' Private Information via the Data Breach;

l. Whether Microf had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m. Whether Microf breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n. Whether Microf knew or should have known that its data security systems and monitoring processes were deficient;

o. What damages Plaintiff and Class Members suffered as a result of Microf's misconduct;

p. Whether Microf's conduct was negligent;

q. Whether Microf's conduct was *per se* negligent;

r. Whether Microf was unjustly enriched;

s. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

t. Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

u. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

140. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

141. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

142. **Predominance.** Microf has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Microf's conduct affecting Class Members set out above predominate over any

individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

143. **<u>Superiority.</u>** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Microf In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

144. Microf has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

145. Finally, all members of the proposed Class are readily ascertainable. Microf has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have

already been preliminarily identified and sent notice of the Data Breach by Microf

## VII.  CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and the Nationwide Class)

146.  Plaintiff restates and realleges the allegations stated in paragraphs 1–145 as if fully set forth herein.

147.  Microf knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

148.  Microf's duty also included a responsibility to implement processes by which it could detect and analyze a breach of its security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

149.  Microf knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Microf was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

150.    Microf owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to it. Microf's duties included, but were not limited to, the following:

 a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

 b. To protect customers' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

 c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

 d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to the FTCA and applicable state laws;

 e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

 f. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

151.    Microf's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45,

which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

152.   Microf's duty also arose because Defendant was bound by industry standards to protect its customers' confidential Private Information.

153.   Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Microf owed them a duty of care to not subject them to an unreasonable risk of harm.

154.   Microf, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Microf's possession.

155.   Microf, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

156.   Microf, through its actions and/or omissions, breached its duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

157. Microf breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTC Act and other applicable laws;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

158. Microf acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures

to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

159.  Microf had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Microf with their Private Information was predicated on the understanding that Microf would take adequate security precautions. Moreover, only Microf had the ability to protect its systems (and the Private Information that it stored on them) from attack.

160.  Microf's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised and/or exfiltrated as alleged herein.

161.  As a result of Microf's ongoing failure to notify Plaintiff and Class Members regarding exactly what Private Information has been compromised, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

162.  Microf's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and/or loss of time and money to monitor their accounts for fraud.

163.  As a result of Microf's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of

imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

164.   Microf also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

165.   As a direct and proximate result of Microf's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

166.   The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

167.   Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

168.   In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Microf to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
## NEGLIGENCE *PER SE*
## (On behalf of Plaintiff and the Nationwide Class)

169.  Plaintiff restates and realleges the allegations stated in paragraphs 1–145 as if fully set forth herein.

170.  Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

171.  Defendant breached its duties to Plaintiff and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

172.  Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

173.  Plaintiff and Class Members are within the class of persons the FTCA was intended to protect and the harm to Plaintiff and Class Members resulting from the Data Breach was the type of harm against which the FTCA was intended to prevent.

174.  But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not

have been injured.

175.   The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendant knew or should have known that by failing to meet its duties, Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

176.   As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiff and the Nationwide Class)

177.   Plaintiff restates and realleges the allegations stated in paragraphs 1–145 as if fully set forth herein.

178.   Defendant provided financial services to Plaintiff and Class Members.

179.   Defendant collected and held the Private Information of Plaintiff and Class Members during the ordinary course of business. Holding Plaintiff and Class Members' Private Information was part of Defendant's regular business practices.

180.   When Plaintiff and Class Members used Defendant's services, they agreed to have their Private Information stored in Defendant's network.

181.   Plaintiff and Class Members entered implied contracts with Defendant in which Defendant agreed to safeguard and protect such Information and to timely detect any breaches of their Private Information. Plaintiff and Class Members were required to share Private Information to obtain services. In entering such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

182.   Plaintiff and Class Members fully performed their obligations under their implied contracts with Defendant.

183.   Defendant's implied promises to Plaintiff and Class Members include, but are not limited to: (i) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (ii) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (iii) restricting access to qualified and trained employees and/or agents; (iv) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (v) applying or requiring proper encryption; (vi) implementing multifactor authentication

for access; and (vii) taking other steps to protect against foreseeable data breaches.

184.  Defendant breached these implied promises it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information and by failing to notify Plaintiff and Class Members thereof within a reasonable time.

185.  Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

186.  Had Defendant disclosed to Plaintiff and the Class that it did not have adequate computer systems and security practices in place to secure such sensitive data, Plaintiff and Class Members would not have provided their Private Information to Defendant.

187.  Defendant recognized that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

188.  Defendant violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information.

189.    Plaintiff and Class Members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

190.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free lifetime credit monitoring to all Class Members.

### COUNT IV
### UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Nationwide Class)

191.    Plaintiff restates and realleges the allegations stated in paragraphs 1–145 as if fully set forth herein.

192.    This Count is pleaded in the alternative to Count III above.

193.    Plaintiff and Class Members conferred a benefit on Defendant. Specifically, they provided Defendant with their Private Information, which Private Information has inherent value. In exchange, Plaintiff and Class Members should have been entitled to have Defendant protect their Private Information with adequate data security.

194.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Defendant profited from

Plaintiff's retained data and used Plaintiff and Class Members' Private Information for business purposes.

195.   Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

196.   Defendant acquired the Private Information through inequitable record retention as it failed to disclose the inadequate security practices previously alleged.

197.   If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to secure their Private Information, they would have made alternative financing choices that excluded Defendant.

198.   Plaintiff and Class Members have no adequate remedy at law.

199.   Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

200.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) the imminent and substantial risk of actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-

of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

201. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

202.   Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## VIII. <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of herself and the Classes described above, seek the following relief:

    a.  An order certifying this action as a Class action under Federal Rule of Civil Procedure 23, defining the Classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

    b.  Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

    c.  An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

    d.  An order instructing Microf to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Microf to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses pursuant to O.C.G.A. Section 13-6-11 and as otherwise allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATE: December 30, 2025             Respectfully submitted,

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson
GA Bar No. 725843
**Gibson Consumer Law Group, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA  30342
Telephone: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

Tyler J. Bean
(*pro hac vice* application forthcoming)
Kennedy M. Brian
(*pro hac vice* application forthcoming)

**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: kbrian@sirillp.com

*Counsel for Plaintiff and the Putative Class*